UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BARRY GIBBS**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE CITY OF NEW YORK, LOUIS EPPOLITO, SR., JAMES FAIRCHILD, LOUIS RANGO, JOHN MULDOON, ANTHONY MARRA, and JOHN AND JANE DOE SUPERVISORS,**<br><br>**Defendants.** | 06 5112<br><br>GLASSER, J.<br>POHORELSKY, M.J. |

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 22 2006 ★
BROOKLYN OFFICE

**COMPLAINT AND JURY DEMAND**

Plaintiff Barry Gibbs, by and through his attorneys, the law firm of Cochran, Neufeld & Scheck, LLP, states as follows:

1. This case arises from one of the most serious incidents of police misconduct in the history of the New York City Police Department ("NYPD"). Plaintiff Barry Gibbs served eighteen years, ten months, and fourteen days in jail and prison for a crime that he did not commit, as a direct result of multiple, intentional, or reckless violations of his constitutional rights by defendant Detective Louis Eppolito and other NYPD officers.

2. The outrageous misconduct perpetrated against Mr. Gibbs was part and parcel of an open and notorious pattern of constitutionally inadequate investigative practices by Mr. Eppolito and a cohort of fellow detectives. Mr. Eppolito and his fellow rogue detectives violated the constitutional rights of Mr. Gibbs, as well as other criminal suspects, in the routine performance of their regular law enforcement duties, and with the active or tacit approval of supervisors -

both direct and at the highest levels of the NYPD chain of command - who actually or constructively knew of Eppolito's and his colleagues' practices, yet failed to monitor, discipline, or supervise those officers.

3. Mr. Gibbs consistently maintained his innocence, worked tirelessly throughout his wrongful incarceration to clear his name, and in 2005 was finally vindicated when, in response to a joint motion filed by the Kings County District Attorney, his conviction was vacated and he was released from prison. Mr. Gibbs's arrest, indictment, prosecution, conviction, and almost nineteen years of wrongful imprisonment would not have occurred in the absence of police misconduct of the most extreme order. If not for the efforts of defendant Louis Eppolito, who deliberately deprived Mr. Gibbs of his constitutional rights with the knowledge and assistance of his fellow police officers, supervisors, and the New York City Police Department itself, Mr. Gibbs would never have been arrested, charged, and convicted, and never would have lost nearly nineteen years of his life and freedom.

4. On November 14, 1986 Mr. Gibbs was arrested for the murder of Virginia Ann Robertson, and on January 31, 1988, following a jury trial, he was convicted of second degree murder. On March 25, 1988 Mr. Gibbs was sentenced to twenty-years-to-life in prison.

5. At the time of Mr. Gibbs's arrest, his son, Mitchell, was twelve years old. Mitchell was thirty-one years old when Mr. Gibbs was finally released from prison in 2005.

6. On September 29, 2005 Mr. Gibbs's conviction was vacated after the State's only eyewitness at the criminal trial, who had testified that he had seen Mr. Gibbs disposing of the victim's body, revealed that he in fact had never seen Mr. Gibbs at the scene of the crime, and had never believed that Mr. Gibbs was the individual he had seen disposing of Ms. Robertson's body, but

had identified Mr. Gibbs and testified against him only under coercion and intimidation by NYPD detectives, including defendant Eppolito.

7. Mr. Mitchell came forward after defendant Eppolito was arrested on federal racketeering charges in Las Vegas, Nevada. Upon searching Mr. Eppolito's home, authorities discovered the nearly two-decades-old NYPD investigative file pertaining to Barry Gibbs - retained by the retired Eppolito in violation of NYPD policy.

8. In fact, Mr. Mitchell's revelations are only the tip of an iceberg of pervasive police misconduct which was committed by defendant Eppolito and others as part of their everyday investigative activities carried out on behalf of the NYPD, and was condoned and facilitated by a climate of grossly inadequate supervision within the ranks of the Department. As early as 1984, supervisors at the highest levels of the New York City Police Department had actual or constructive knowledge that defendant Eppolito not only regularly employed improper and illegal tactics in the course of criminal investigations, but also had active ties to New York organized crime figures. Armed with this knowledge, NYPD supervisors permitted, and in some instances actively facilitated, investigative conduct by defendant Eppolito and his fellow NYPD detectives that violated minimally accepted police practices, NYPD policy, and the law. As a direct result of this grossly negligent and deliberately indifferent failure of supervision, as well as the NYPD's custom or practice of maintaining obviously and utterly inadequate mechanisms for detecting, monitoring, and disciplining officer misconduct, detectives like Eppolito were free to conduct investigations in any manner they saw fit, and to obtain collars at any cost, regardless of the innocence or guilt of those who they arrested and prosecuted.

9. As a direct result of the defendants' intentional, bad faith, willful, wanton, reckless, and/or

deliberately indifferent acts and omissions, Barry Gibbs was deprived of his federal constitutional rights, was robbed of nearly nineteen years of his life and freedom, and sustained severe physical, emotional, and monetary damages.

**JURISDICTION**

10. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

11. Supplemental jurisdiction over Mr. Gibbs's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

12. Plaintiff has complied with the requirements of New York General Municipal Law Section 50-I by making and serving a notice of claim on the Comptroller of the City of New York on December 20, 2005, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

13. At the request of the City of New York Plaintiff submitted to a hearing pursuant to New York General Municipal Law Section 50-e.

**VENUE**

14.Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of New York, the judicial district in which the claims arose, and in which defendant Louis Eppolito currently is located.

**JURY DEMAND**

15. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

16. Plaintiff Barry Gibbs is, and at all times material to this Complaint was, a citizen and resident of the State of New York. He remains a citizen of New York and resides in New York, New York.

17. Defendant City of New York is a municipality that is a political subdivision of the State of New York, was the employer of the individual defendants, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the New York City Police Department ("NYPD").

18. Defendant Louis Eppolito, Sr. at all times relevant to this complaint was a duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.

19. Defendant James Fairchild at all times relevant to this complaint was a duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.

20. Defendant Louis Rango at all times relevant to this complaint was a duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.

21. Defendant John Muldoon at all times relevant to this complaint was a duly appointed and acting police officer and supervisor of the NYPD with the rank of sergeant, acting under color of

law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.

22. Defendant Anthony Marra at all times relevant to this complaint was a duly appointed and acting police officer and supervisor of the NYPD with the rank of lieutenant, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.

23. Defendant John and Jane Doe Supervisors, who include both direct supervisors as well as command-level supervisors within the NYPD Detective Division, Training Bureau, Internal Affairs Division, and other NYPD divisions, were at all times relevant to this complaint duly appointed and acting police officers and supervisors of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.

## FACTS

### The Crime

24. At approximately 1:55 p.m. on November 4, 1986 the body of an unidentified African American woman was discovered by United States Parks Service Officers Paul Dorogoff and J. Lynch, lying under a blue blanket on a bike path near the entrance to the Jamaica Bay Riding Academy in Brooklyn, New York. The woman had been strangled to death.

25. The woman was subsequently identified as Virginia Ann Robertson, a 27-year-old woman from East Flatbush.

26. Ten to fifteen minutes before Park Police radioed that they had discovered the body, United States Parks Service Detective Gentile was driving east on the Mill Basin Bridge on the Belt

Parkway and observed a white man with a mustache, in his forties and approximately 5'6" to 5'8" in height, leaning against a car parked near the entrance to the Jamaica Bay Riding Academy. The man was leaning against a gray car that appeared to be an Oldsmobile from the late 1970's. Detective Gentile observed the man and the car for approximately ten to twelve seconds.

27. Upon receiving the radio transmission about the discovery of the body in the same location where he had observed the man and the car, Detective Gentile drove to the Jamaica Bay Riding Academy. When he arrived at the scene Officers Dorogoff and Lynch and United States Parks Service Sergeant Rivera were present, together with an individual by the name of Peter Mitchell, who was identified as a witness.

28. Peter Mitchell, a 26-year-old African American man and a former Marine, had two prior criminal convictions, was under supervision of the California Department of Parole, and was in violation of his parole reporting obligations.

29. Mr. Mitchell claimed that while he had been jogging on the Belt Parkway he had observed an individual approximately fitting the description of the man observed by Detective Gentile, removing a body, wrapped in a blue blanket, from a gray Oldsmobile parked at the Riding Academy entrance. Mr. Mitchell would later state that he saw the man for no more than three seconds, and that he had viewed the man from about 1000 feet away, on the Mill Basin Bridge. Detective Gentile interviewed Mr. Mitchell at the scene.

30. On November 4, 1986 Barry Gibbs was five feet, eleven inches tall, weighed approximately 212 pounds, and had no facial hair.

31. Following the initial response and investigation conducted by the Park Police, NYPD personnel responded to the Riding Academy and, because Ms. Robertson's body was discovered

on New York City property, took over the investigation from the Park Police. Detectives Canderossi and Ruggiero and Officer Prior interviewed Detective Gentile, Officers Dorogoff and Lynch, and Peter Mitchell.

32. During interviews with NYPD officers Peter Mitchell's account of what he had seen from the Mill Basin Bridge shifted, and revealed - within only an hour of Mr. Mitchell's alleged observations - that his credibility and capacity for observation were limited. For example, while he told Detectives Gentile and Ruggiero that the man he had seen was in his forties, Mitchell told Officer Prior that the man was in his sixties.

33. On information and belief, Detective Canderossi prepared notes and/or a report of a full interview with and statement of Peter Mitchell, which documented discrepancies in Mr. Mitchell's cross-racial identification and other observations. This document was never produced to prosecutors or to Mr. Gibbs's defense counsel.

**Detective Eppolito Takes Over the Investigation**

34. At approximately four o'clock p.m. on November 4, defendant NYPD Detective Eppolito arrived at the entrance to the Jamaica Bay Riding Academy and informed Detective Canderossi that he, Eppolito, had been assigned as the lead detective in the investigation, and that he would be taking over the investigation from Canderossi. Also present with Eppolito were his partner, defendant NYPD Detective Fairchild, and other NYPD personnel.

35. Mr. Gibbs was known to Detective Fairchild, who approximately one year earlier had arrested Mr. Gibbs at his home, which was located near the home of Ms. Robertson. On November 4, 1986 Barry Gibbs was 38 years old and lived in East Flatbush, Brooklyn, a predominantly African American neighborhood.

36. At the time of and prior to the Robertson murder investigation, defendant Eppolito had an open and notorious practice of conducting investigations in a manner that was contrary to the law, to minimally accepted police practices, and to NYPD protocol, including coercing and threatening witnesses and suspects, wrongfully employing intimidation and excessive force, conducting unduly suggestive identification procedures, and deliberately failing to accurately and fully document and disclose his investigative activities. These practices, which among other things enabled Eppolito to maintain a high rate of closing cases, thus contributing to him becoming a highly decorated NYPD detective, were actually and constructively known to his fellow detectives and supervisors. Despite that knowledge, NYPD supervisors, including defendants Muldoon, Marra, and John and Jane Doe Supervisors, permitted Eppolito to beat and otherwise coerce suspects and witnesses - including, as in this case, in the precinct. Moreover, these supervisors failed to investigate or monitor use of force complaints against Eppolito, failed to investigate allegations of Eppolito's misconduct made by civilians and NYPD personnel, failed to scrutinize his investigations or his documentation thereof, and otherwise failed to respond to the significant, obvious, and foreseeable risk that Eppolito and fellow detectives would violate the constitutional rights of citizens.

37. Eppolito's routine and notorious investigative misconduct, committed during the course of his everyday investigations as an NYPD detective and with the tacit approval and active facilitation of the chain of command, reflected a disregard for the constitutional rights of citizens and norms of police integrity that manifested in even more serious misconduct in which he was actively engaged at all times relevant to this complaint.

38. Beginning as early as 1979, defendant Eppolito was, in addition to his employment as an

NYPD detective, also employed by La Cosa Nostra, a nationwide criminal organization. Eppolito, together with fellow NYPD detective Steven Caracappa, accepted payments from La Costa Nostra in exchange for using his position within the NYPD, both while off-duty and on-duty, to enrich La Cosa Nostra and to participate in and facilitate kidnapings, murders, and other brutal criminal endeavors on behalf of La Cosa Nostra.

39. The NYPD was on actual or constructive notice not only of Eppolito's routine investigative misconduct but also of the shocking criminal endeavors that this misconduct facilitated as early as 1984, when the Federal Bureau of Investigation and the NYPD discovered NYPD files in the home of a La Cosa Nostra operative and heroin dealer, Rosario Gambino. An investigation by the NYPD Internal Affairs Division led to disciplinary charges being brought against Eppolito for passing the NYPD files to Gambino, but in 1985 he was acquitted of those charges - despite evidence linking him both to the files and to Mr. Gambino. Eppolito was reinstated as a detective following his acquittal.

40. Despite actual and constructive knowledge on the part of NYPD supervisors at the precinct and command levels of the Department that the IAD investigation had been inadequate, and despite knowledge by those supervisors that Eppolito routinely conducted his criminal investigations in a manner that violated both the law and NYPD protocols, defendants Muldoon, Marra, and John and Jane Doe Supervisors continued to fail to supervise, monitor, or discipline Eppolito after his reinstatement, and knowingly permitted at least some of this misconduct.

41. In fact, in the wake of his acquittal, Eppolito carried out his organized crime activities with even greater intensity and impunity. Between January and February 1986, less than a year after his reinstatement, Eppolito, together with Caracappa, participated in the kidnaping and murder of

Israel Greenwald on behalf of La Cosa Nostra. Between September and December 1986 - the very time period of the Robertson murder investigation - Eppolito and Caracappa participated in the kidnaping and murder of James Hydell and Nicholas Guido. And during 1987 and 1988 - when Eppolito testified twice in criminal proceedings against Mr. Gibbs - Eppolito and Caracappa engaged in witness tampering and obstruction of justice at the behest of La Cosa Nostra.

42. From the moment defendant Eppolito assumed his police duties with respect to the Robertson murder investigation, he approached it in the manner that was his custom as an NYPD detective: To close the case by any means necessary, without regard for the constitutional rights of witnesses or suspects in the case. Thus, upon taking over the crime scene on November 4, Eppolito was informed that there were two witnesses, Peter Mitchell and Detective Gentile, who had seen a potential suspect in the case. But despite knowing that Detective Gentile, a federal law enforcement official, had viewed an individual suspected of being the murderer for approximately ten seconds and was one of only two eye witnesses in the case, neither Eppolito, Fairchild, or Rango ever documented or disclosed any conversation or interview with Detective Gentile.

43. Defendants Eppolito, Rango, and Fairchild, with the actual or constructive knowledge of defendants Muldoon, Marra, and John and Jane Doe Supervisors, met with Peter Mitchell on multiple occasions between November 4, 1986 and January 1988, and, through suggestion, coercion, intimidation, and/or physical force caused Peter Mitchell to identify Barry Gibbs as the man who Mr. Mitchell allegedly saw disposing of the body of Virginia Robertson on November 4. The defendants did so despite the fact that they knew or should have known that Mr. Gibbs

was not, in fact, the man who Mr. Mitchell had seen, and that he was not, in fact, guilty of Ms. Robertson's murder.

44. Furthermore, defendants Eppolito, Rango, and Fairchild, with the actual or constructive knowledge of defendants Muldoon, Marra, and John and Jane Doe Supervisors, deliberately fabricated witness statements and police reports, withheld from prosecutors material, exculpatory evidence, and intentionally failed to conduct an adequate investigation in order to make it appear that Mr. Mitchell's identification of Mr. Gibbs was consistent with early physical descriptions given by Mr. Mitchell, and that it was corroborated by other, consistent evidence of Mr. Gibbs's culpability in the murder of Virginia Robertson.

45. On information and belief, between November 4 and November 14, 1986 defendants Eppolito, Rango, and Fairchild conducted interviews with additional witnesses, during which suggestion, coercion, intimidation, and/or physical force were employed to secure false evidence against Barry Gibbs. The defendants created fabricated documentation of those witness interviews and statements, and through those documents as well as statements to prosecutors and others falsely represented that the witnesses had volunteered consistent and corroborating information, when in actuality many of the facts allegedly obtained from the witnesses had originated with the defendant police officers. The defendants also failed to disclose the material, exculpatory fact that they had employed suggestion, coercion, intimidation, and/or physical force with the witnesses.

46. In fact, defendants Eppolito, Rango, and Fairchild knew or should have known that, although there was evidence that Barry Gibbs had been acquainted with Virginia Robertson, no other evidence linked him to her murder, and in fact Mr. Gibbs did not fit the physical descriptions

that Peter Mitchell had given of the white man who he had seen at the Jamaica Bay Riding Academy entrance on November 4.

47. Despite this knowledge, on November 14, 1986 defendants Eppolito and Rango sought and obtained from Kings County prosecutors a determination that there was probable cause to arrest Barry Gibbs for the purpose of conducting a lineup identification procedure that would be viewed by Peter Mitchell.

48. During this meeting with prosecutors, Eppolito and Rango presented fabricated evidence and failed to disclose material, exculpatory facts that would have vitiated probable cause, including but not limited to the fact that Eppolito and Rango knew that Peter Mitchell's initial description of the man he had seen disposing of the body of Virginia Robertson did not match that of Barry Gibbs, and that the defendants had used suggestion, coercion, intimidation, and physical force in interviewing witnesses and obtaining suspect descriptions.

49. On November 14, 1986 defendants Eppolito and Rango arrested Barry Gibbs in front of his Brooklyn home.

50. After arriving at the 63rd Precinct, Rango left Mr. Gibbs in an office with Eppolito, who at that time took at least one Polaroid photograph of Mr. Gibbs, and then interrogated Mr. Gibbs about his knowledge of Virginia Robertson. During this interrogation, defendant Eppolito repeatedly slapped and beat Mr. Gibbs so violently that other NYPD officers entered the room to pull Eppolito off of Mr. Gibbs.

51. The unjustified use of excessive force in interrogations of witnesses and suspects was an open, notorious, and customary practice for defendant Eppolito, and was known or should have been known by his fellow detectives and supervisors, including defendants Rango, Fairchild,

Muldoon, Marra, and John and Jane Doe Supervisors.

52. During the interrogation Eppolito told Mr. Gibbs that an eyewitness could place him at the scene of the crime. Mr. Gibbs agreed to stand in a live lineup, so long as a prosecutor was present.

53. Eppolito had already contacted Peter Mitchell by phone earlier in the day, and had instructed him to be ready to come to the 63rd Precinct to participate in a lineup identification procedure.

54. Eppolito subsequently contacted defendant Fairchild, who was not on duty on November 14, and instead was working his off-duty job as a rug installer. Eppolito asked Fairchild to pick up Peter Mitchell and transport him to the 63rd Precinct for the lineup, which Fairchild knew would include Barry Gibbs. Fairchild left his job, picked up Peter Mitchell, and drove him to the 63rd Precinct. On information and belief, Fairchild, Eppolito, and others made suggestive, coercive, and/or threatening comments to Peter Mitchell in order to ensure that Mr. Mitchell would select Barry Gibbs from the lineup.

55. Peter Mitchell subsequently viewed a lineup that included Mr. Gibbs and five "fillers," and selected Mr. Gibbs as the person who Mr. Mitchell had seen disposing of Ms. Robertson's body on November 4. As a result of the intentional and reckless conduct of Eppolito, Fairchild, and Rango, individually and in concert, the lineup procedure was unduly suggestive, and designed to cause Mr. Mitchell to select Mr. Gibbs from the lineup notwithstanding that Eppolito, Fairchild, and Rango were aware that Mr. Mitchell did not believe that Mr. Gibbs was the man he had seen on November 4. The suggestive features of the procedure included the following:

A. Eppolito and Fairchild provided direct suggestion to and/or coerced and threatened Mr. Mitchell before and/or during the lineup in order to cause him to

select Mr. Gibbs;

B. Eppolito recklessly and/or deliberately selected lineup "fillers" who bore no resemblance to Mr. Gibbs and did not match the initial suspect descriptions given by Mr. Mitchell, and all of whom were police officers who had been in the 63rd Precinct either on November 14, or on November 4, or both days. Eppolito knew and/or should have known that Mr. Mitchell actually recognized one or more of the fillers as police officers.

56. Neither the lineup shown to Peter Mitchell, nor any other live or photographic lineup was ever viewed by Detective Gentile. Defendants Eppolito, Rango, and Fairchild failed take the basic investigative step of procuring a corroborative identification from Detective Gentile because they knew that Detective Gentile could not properly identify Mr. Gibbs.

57. Based on the unduly suggestive lineup identification, the suggestive circumstances of which were never documented or disclosed to the prosecutor, Mr. Gibbs was arrested for the murder of Virginia Robertson.

58. After being taken into custody, Mr. Gibbs was interviewed by a Kings County prosecutor, during which he proclaimed his innocence and consented to a search of his apartment. Later in the evening of November 14, Mr. Gibbs's apartment was searched by defendant Eppolito and other NYPD personnel. Nothing was found in the apartment that linked him to Virginia Robertson or her murder. Although the officers recovered a pair of red pants - the same color of pants that the man seen disposing of Virginia Robertson's body allegedly had worn - the pants, which were several sizes too small for Mr. Gibbs, clearly could not have been worn by him on November 4, 1986.

**The Criminal Trial**

59. The primary evidence against Mr. Gibbs at trial was the identification testimony of Peter Mitchell.

60. No forensic evidence was presented at trial linking Mr. Gibbs to the crime, despite the fact that he provided hair samples for comparison to Caucasian hairs found on the clothing of the victim. On information and belief, exculpatory or potentially exculpatory forensic evidence existed at the time of Mr. Gibbs's investigation and/or trial, and defendant Eppolito, who, as lead detective, had primary contact with the Medical Examiner and NYPD Crime Laboratory concerning, and primary control over, that evidence - including, without limitation, a rope that was introduced at trial as a potential murder weapon, hair samples taken from the victim's clothing and body, personal effects of the victim, hair samples from Barry Gibbs's head and apartment, and clothing and personal effects from Barry Gibbs's apartment - took steps to prevent the discovery of, withhold, and/or tamper with that evidence.

61. The only other direct evidence against Mr. Gibbs was presented in the form of testimony from Henry Fogelman, a professional jailhouse snitch with fourteen prior convictions who, by his own account, had been an informant in approximately ten cases. Mr. Fogelman testified, falsely, that Mr. Gibbs had confessed his guilt while incarcerated in pretrial detention at Riker's Island.

62. The veracity of Mr. Fogelman's account of Mr. Gibbs's "confession" was severely undermined at trial. For example, the jury heard evidence of Mr. Fogelman's extensive criminal history and his long-standing informant relationship with law enforcement authorities, and learned that when Mr. Gibbs allegedly "confessed" Mr. Fogelman was in fact at Riker's Island at

the behest of police and prosecutors for the purpose of informing on another inmate. The jury also heard that, during the time when Mr. Gibbs and Mr. Fogelman were housed together at Riker's Island, Fogelman had, without authorization, gained access to Mr. Gibbs's cell and to legal papers relating to his criminal defense.

63. In addition, several details of Mr. Gibbs's "confession" were patently false, including Mr. Gibbs's alleged statement that an eyewitness had seen him on November 4 and that he had a full beard and mustache at that time. In fact, no eyewitness had ever described the man who disposed of Virginia Robertson's body as having a beard, and other witnesses at trial testified that Mr. Gibbs had been clean-shaven since the summer of 1986.

64. Prior to trial, Mr. Gibbs moved, through counsel, to suppress the lineup identification of Mr. Mitchell on the ground that it was procured in an unduly suggestive manner. Neither at the time of the suppression hearing, nor at the time of trial, when Mr. Mitchell's testimony provided the only direct evidence linking Mr. Gibbs to the crime scene, was the prosecutor or defense counsel aware that Mr. Mitchell had been coerced by defendants Eppolito, Rango, and Fairchild into identifying Mr. Gibbs, and that police reports documenting interviews with Mr. Mitchell had been fabricated in order to appear to give corroboration to his false and coerced identification. Disclosure of these material, exculpatory facts would likely have resulted in the pretrial exclusion of Mr. Mitchell's identification testimony, without which Mr. Gibbs could not have been convicted.

65. At a minimum, disclosure of the defendants' suggestive and coercive conduct toward Mr. Mitchell and other witnesses, their fabrications of statements by Mr. Mitchell and other witnesses, and the unduly suggestive manner in which the lineup identification of Mr. Gibbs was

deliberately procured would not only have fatally undermined the credibility of Mr. Mitchell's identification of Mr. Gibbs, but also would been powerful evidence to impeach the trial testimony of defendants Eppolito and Fairchild, as well as Henry Fogelman and other witnesses.

**DAMAGES**

66. The actions of the defendants deprived Plaintiff Barry Gibbs of his civil rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and the laws of New York.

67. The unlawful, intentional, wilful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Barry Gibbs to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve eighteen years, ten months, and fourteen days in jail and prison for a crime he did not commit.

68. The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Barry Gibbs the following injuries and damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; damage to business and property; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

69. All the acts and omissions committed by the defendants described herein for which liability

is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

**COUNT I**

**42 U.S.C. § 1983 4th and 14th Amendment Claims for False Arrest, Malicious Prosecution, and False Imprisonment**

70. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

71. Defendants Eppolito, Rango, and Fairchild, despite knowing that probable cause did not exist to arrest and prosecute Mr. Gibbs for the murder of Virginia Robertson, acted individually and in concert to cause Mr. Gibbs to be arrested and prosecuted for that crime, thereby violating Mr. Gibbs's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures.

72. Specifically, despite the fact that the defendants were aware of information that probable cause did not exist to arrest Mr. Gibbs, the defendants intentionally caused Mr. Gibbs to be arrested and prosecuted for the murder of Virginia Robertson. Furthermore, the defendants intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Mr. Gibbs, including but not limited to the fact that suspect descriptions implicating Mr. Gibbs, witness statements connecting Mr. Gibbs and Ms. Robertson, the lineup identification by Mr. Mitchell, and other evidence against Mr. Gibbs were the product of fabrication and coercion. The defendants performed the above-described acts deliberately, with reckless disregard for the truth, and with malice.

73. In fact, Mr. Gibbs, as he stated from the time of his arrest and maintained throughout his

wrongful incarceration, was innocent of the murder of Virginia Robertson. On September 29, 2005, the prosecution terminated in Mr. Gibbs's favor when his conviction was vacated and he was released after nearly nineteen years of wrongful imprisonment.

74. Mr. Gibbs's causes of action for false arrest, malicious prosecution, and false imprisonment were unavailable to him until September 29, 2005, because successful adjudication of those claims necessarily implies the invalidity of any conviction or sentence resulting from the criminal proceedings against him. Furthermore, the defendants concealed from Mr. Gibbs - and still are concealing to this day - the facts vitiating probable cause to arrest and prosecute Mr. Gibbs.

75. But for the defendants' conduct Mr. Gibbs would not have been arrested and/or prosecuted for the murder or Virginia Robertson.

76. Defendants' actions to deprive Mr. Gibbs of his liberty without probable cause were in violation of clearly established constitutional law, including *Franks v. Delaware*, 438 U.S. 154 (1978), and no reasonable police officer in 1986 would have believed that the defendants' actions were lawful.

77. As a direct and proximate result of the defendants' actions Mr. Gibbs was wrongly convicted and imprisoned for nearly nineteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

**COUNT II**

**42 U.S.C. § 1983 14th Amendment Claims for Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Conducting Unduly Suggestive Identification Procedures, Withholding Material, Exculpatory and Impeachment Evidence,**

**and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**

78. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

79. Defendants Eppolito, Rango, and Fairchild, acting individually and in concert, coerced witnesses, fabricated evidence, conducted unduly suggestive identification procedures, and withheld material, exculpatory and impeachment evidence, thereby depriving Mr. Gibbs of his clearly established constitutional right, pursuant to the Fourteenth Amendment, to a fair trial.

80. Specifically, the defendants, deliberately and with reckless disregard for the constitutional rights of Mr. Gibbs, coerced and fabricated statements from Peter Mitchell and others, by using physical and psychological force to procure those witnesses' statements, and by falsely representing in police reports, in pretrial conversations with prosecutors, and during Mr. Gibbs's trial that the facts recounted by those witnesses originated with the witnesses when in fact they had been fed to the witnesses or otherwise fabricated by the defendant police officers.

81. Furthermore, the defendants deliberately and with reckless disregard for the constitutional rights of Mr. Gibbs failed to disclose to prosecutors their coercion and fabrications, as well as other material, exculpatory and impeachment evidence, including but not limited to witness statements, forensic evidence, and investigative misconduct on the part of the defendants and others. Had this evidence been documented and/or disclosed it would have tended to prove Mr. Gibbs's innocence, cast doubt on the entire police investigation of the Virginia Robertson murder, impeached the critical trial testimony of Peter Mitchell, Henry Fogelman, defendants Eppolito and Fairchild, and other witnesses, and undermined confidence in the verdict against Mr. Gibbs.

82. The defendants also deliberately and with reckless disregard of the constitutional rights of Mr. Gibbs conducted coercive and unduly suggestive identification procedures with Peter Mitchell. As a direct and proximate result of the defendants' use of coercive and unduly suggestive identification procedures, Peter Mitchell falsely testified before the grand jury and at Mr. Gibbs's criminal trial that he had seen Mr. Gibbs disposing of the body of Virginia Robertson. But for the defendants' actions, Mr. Gibbs would not have been indicted for or convicted of the murder of Ms. Robertson.

83. In their drive to secure Mr. Gibbs's wrongful conviction, the defendants deliberately failed to investigate leads pointing toward other suspects and corroborating Mr. Gibbs's innocence, including but not limited to intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Gibbs's guilt and failing to investigate exculpatory and potentially exculpatory forensic evidence. The defendants purposefully failed to conduct a thorough and adequate criminal investigation into the murder of Virginia Robertson because they knew or should have known that such an investigation would have exonerated Mr. Gibbs.

84. Mr. Gibbs's causes of action for denial of his liberty without due process of law and for denial of his right to a fair trial were unavailable to him until September 29, 2005, because successful adjudication of those claims necessarily implies the invalidity of any conviction or sentence resulting from the criminal proceedings against him. Furthermore, the defendants concealed from Mr. Gibbs - and still are concealing to this day - the coercion of witnesses, fabrication of evidence, unduly suggestive identification procedures, withholding of material, exculpatory evidence, deliberate failures to investigate, and other facts giving rise to these claims.

85. The defendants' conduct violated Mr. Gibbs's clearly established constitutional right to a fair trial and due process of law as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1986 would have believed that the actions taken by the defendants in coercing witnesses, fabricating evidence, conducting coercive and unduly suggestive identification procedures, failing to document and disclose material, exculpatory evidence, and failing to conduct a constitutionally adequate investigation were lawful. As a direct and proximate result of the defendants' actions Mr. Gibbs was wrongly convicted and imprisoned for nearly nineteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

**COUNT III**

**42 U.S.C. § 1983 Claim for Failure to Intercede**

86. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

87. By their conduct and under color of state law, defendants Eppolito, Rango, Fairchild, Muldoon, Marra, and John and Jane Doe Supervisors, had opportunities to intercede on behalf of Mr. Gibbs to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

88. The defendants' failures to intercede violated Mr. Gibbs's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1986 would have believed that failing to intercede to prevent the defendants from coercing witnesses, fabricating evidence, conducting coercive and unduly suggestive

identification procedures, failing to document and disclose material, exculpatory evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Gibbs to be arrested and prosecuted without probable cause were lawful. As a direct and proximate result of the defendants' failures to intercede Mr. Gibbs was wrongly convicted and imprisoned for nearly nineteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT IV

### 42 U.S.C. § 1983 Civil Rights Conspiracy Claim

89. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

90. Defendants Eppolito, Rango, Fairchild, Muldoon, and Marra, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals, to act in concert in order to deprive Mr. Gibbs of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

91. In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

A. Defendants Eppolito, Rango, and Fairchild procured, through direct suggestion, coercion, intimidation, and/or physical force, Peter Mitchell's false identification of Barry Gibbs, despite the fact that they knew or should have known that Peter Mitchell had not seen Barry Gibbs on November 4, 1986;

B. Defendants Eppolito, Rango, and Fairchild coerced, intimidated, and threatened witnesses in order to obtain what the defendants knew to be false evidence corroborating Mitchell's false identification of Mr. Gibbs;

C. Defendants Eppolito, Rango, and Fairchild deliberately fabricated reports and other accounts of their investigative activities, and failed to document and disclose material, exculpatory evidence to prosecutors;

D. Defendants Eppolito, Rango, and Fairchild intentionally or with deliberate indifference failed to conduct an adequate investigation of the case, which would have uncovered evidence undermining Mr. Mitchell's false identification of Mr. Gibbs;

E. Eppolito, Fairchild, and Mitchell deliberately provided perjured testimony in the grand jury and/or in Mr. Gibbs's criminal trial;

F. Defendants Muldoon and Marra signed off on investigative reports and authorized the decision to arrest Mr. Gibbs, notwithstanding that they knew or should have known that defendants Eppolito, Rango, and Fairchild had conducted their investigation, as they conducted other investigations, in a manner that violated the constitutional rights of Mr. Gibbs.

92. As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Gibbs was wrongly convicted and imprisoned for nearly nineteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

**COUNT V**

**42 U.S.C. § 1983 Supervisory Liability Claim**

93. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

94. The individual defendant police officers, Eppolito, Rango, and Fairchild, acted with impunity in an environment in which they were not trained, supervised, or disciplined by defendants Muldoon, Marra, and John and Jane Doe Supervisors.

95. Defendants Muldoon, Marra, and John and Jane Doe Supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendant police officers, and thereby caused the individual defendant police officers to deprive Mr. Gibbs of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial. Had Defendants Muldoon, Marra, and John and Jane Doe Supervisors not provided grossly inadequate training, supervision, and discipline of the defendant officers, the defendants would not have fabricated evidence, coerced witnesses, conducted unduly suggestive identification procedures, failed to document and disclose exculpatory evidence, and intentionally and maliciously caused Mr. Gibbs to be arrested and prosecuted without probable cause.

96. Specifically, defendants Muldoon, Marra, and John and Jane Doe Supervisors knew or should have known - based on, among other facts, Eppolito's reputation for and open and notorious practice of conducting criminal investigations in a manner that violated the law, minimally accepted police practices, and NYPD protocol, and the 1985 Internal Affairs Division investigation into allegations that defendant Eppolito worked on behalf of organized crime - of a

high degree of risk that defendant Eppolito would conduct criminal investigations in a manner that violated the constitutional rights of citizens.

97. Muldoon, Marra, and John and Jane Doe Supervisors either knew or, in the absence of their grossly inadequate supervision of defendants Eppolito, Rango, and Fairchild, should have known, that Eppolito routinely used unjustified physical violence in the course of criminal investigations and routinely violated the constitutional rights of criminal suspects in the course of criminal investigations, including by coercing and intimidating witnesses, fabricating evidence, conducting unduly suggestive identification procedures, and failing to document and disclose exculpatory evidence, and that Eppolito's partners Fairchild and Rango actively facilitated and participated in this conduct.

98. Moreover, defendants Muldoon, Marra, and John and Jane Doe Supervisors knew or should have known in this case that defendants Eppolito, Rango, and Fairchild followed the above-described practices in the Robertson murder investigation, and coerced and intimidated witnesses, fabricated evidence, conducted unduly suggestive identification procedures, failed to document and disclose material, exculpatory evidence, conducted a constitutionally inadequate investigation, and caused the arrest and prosecution of Mr. Gibbs without probable cause.

99. The grossly negligent, reckless, and/or deliberately indifferent conduct of defendants Muldoon, Marra, and John and Jane Doe Supervisors violated their clearly established duty, in 1986, to supervise defendants Eppolito, Rango, and Fairchild, and no reasonable police supervisor in 1986 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

100. Defendants Muldoon, Marra, and John and Jane Doe Supervisors' actions and omissions proximately and directly caused Mr. Gibbs to be wrongly convicted and imprisoned for nearly nineteen years, and to suffer the other grievous and continuing injuries and damages as set forth above.

**COUNT VI**

**Monell claim against the City of New York**

101. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

102. The City of New York, by and through its final policymakers, maintained a custom, policy, or practice of maintaining grossly inadequate mechanisms for identifying, monitoring, and disciplining police corruption and misconduct. NYPD policymakers were deliberately indifferent to the virtual absence of effective mechanisms, at the precinct and command levels, for discovering, monitoring, supervising, and disciplining problem officers, investigating and punishing misconduct, and maintaining a police culture in which corruption is condemned rather than condoned. The known, obvious, and catastrophic breakdown of NYPD disciplinary structures included precinct-level supervision that turned a blind eye to, or actively facilitated, misconduct by officers and detectives, an Internal Affairs Division that was poorly resourced and that routinely conducted incompetent investigations of police misconduct, and a departmental culture that prioritized covering up corruption over remedying it.

103. As a direct result of the City of New York's custom, policy, or practice of maintaining grossly inadequate mechanisms for identifying, monitoring, and disciplining police corruption and misconduct, the individual defendants in this case coerced and intimidated witnesses,

fabricated evidence, conducted unduly suggestive identification procedures, and failed to document and disclose exculpatory evidence with impunity, which caused Mr. Gibbs to be deprived of his Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial, and directly and proximately caused the other grievous and continuing injuries and damages set forth above.

**COUNT VII**

**State law false arrest, malicious prosecution, and false imprisonment claims**

104. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

105. Defendants Eppolito, Rango, and Fairchild, despite knowing that probable cause did not exist to arrest and prosecute Mr. Gibbs for the murder of Virginia Robertson, intentionally, recklessly, and with malice caused Mr. Gibbs to be arrested, prosecuted, and convicted for the murder of Virginia Robertson. Furthermore, the defendants intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Mr. Gibbs, including but not limited to the fact that suspect descriptions implicating Mr. Gibbs, witness statements connecting Mr. Gibbs and Ms. Robertson, the lineup identification by Mr. Mitchell, and other evidence against Mr. Gibbs were the product of fabrication and coercion.

106. The criminal action ultimately terminated in Mr. Gibbs's favor on September 29, 2005, when his conviction was vacated and he was released from the custody of New York State. The defendants concealed from Mr. Gibbs - and still are concealing to this day - the facts vitiating probable cause to arrest and prosecute Mr. Gibbs.

107. The defendants' conduct directly and proximately caused Mr. Gibbs's wrongful conviction and nearly nineteen years of imprisonment, as well as the other grievous and continuing injuries and damages set forth above.

## COUNT VIII

### State law claim for intentional or reckless infliction of emotional distress

108. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

109. The conduct of defendants Eppolito, Rango, and Fairchild in deliberately causing, or recklessly disregarding the risk of causing, the wrongful arrest, prosecution, and incarceration of Barry Gibbs was extreme and outrageous, and directly and proximately caused the grievous and continuing injuries and damages set forth above.

110. Mr. Gibbs's cause of action for intentional or reckless infliction of emotional distress by the defendants was unavailable to him until September 29, 2005, because successful adjudication of that claim necessarily implies the invalidity of any conviction or sentence resulting from the criminal proceedings against him. Furthermore, the defendants concealed from Mr. Gibbs - and still are concealing to this day - their conduct giving rise to this cause of action.

## COUNT IX

### State law claim for negligent infliction of emotional distress

111. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

112. The defendants negligently and grossly negligently, and in breach of their duties owed to him to refrain from fabricating evidence, coercing witnesses, conducting unduly suggestive

identification procedures, withholding material, exculpatory and impeachment evidence, and otherwise acting to deny him due process of law, directly and proximately caused Mr. Gibbs, an innocent man, to be falsely arrested, malicious prosecuted, and wrongly imprisoned for nearly nineteen years. The defendants' actions caused Mr. Gibbs to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

113. Mr. Gibbs's cause of action for negligent infliction of emotional distress by the defendants was unavailable to him until September 29, 2005, because successful adjudication of that claim necessarily implies the invalidity of any conviction or sentence resulting from the criminal proceedings against him. Furthermore, the defendants concealed from Mr. Gibbs - and still are concealing to this day - their conduct giving rise to this cause of action.

**COUNT X**

**State law respondeat superior claim against the City of New York**

114. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

115. At all times relevant to this complaint the individual defendants acted as agents of, and in the scope of their employment with, defendant City of New York. The conduct by which the defendants committed the torts of false arrest, malicious prosecution, false imprisonment, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while the defendants were on duty, carrying out their routine investigative functions as NYPD detectives, and engaging in such conduct as would have been

reasonably expected by their employer. Indeed, the specific conduct of defendants Eppolito, Rango, and Fairchild was known by, should have been known by, and/or was reasonably foreseeable to NYPD supervisors.

116. The City of New York is liable for its agents' state law torts of malicious prosecution, false imprisonment, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

**COUNT XI**

**State law negligent supervision claim**

117. Mr. Gibbs hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

118. Defendants Muldoon, Marra, and John and Jane Doe Supervisors were grossly negligent and negligent in the training, supervision, and discipline of the defendant detectives, Eppolito, Fairchild, and Rango.

119. Defendants Muldoon, Marra, and John and Jane Doe Supervisors knew or, but for their grossly negligent and negligent training, supervision, and discipline, should have known that defendants Eppolito, Fairchild, and Rango engaged in investigative misconduct including coercing witnesses, fabricating evidence, conducting unduly suggestive identification procedures, and failing to document and disclose material, exculpatory and impeachment evidence, and that they thereby caused Mr. Gibbs to be maliciously prosecuted and falsely arrested.

120. As a proximate result of the gross negligence and negligence of defendants Muldoon, Marra, and John and Jane Doe Supervisors, defendants Eppolito, Fairchild, and Rango engaged

in the previously set forth misconduct and caused the above-described acts of malicious prosecution, false imprisonment, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress inflicted on Mr. Gibbs, which directly and proximately caused Mr. Gibbs's wrongful conviction and nearly nineteen years of imprisonment, as well as the other grievous and continuing injuries and damages set forth above.

**WHEREFORE**, Barry Gibbs prays as follows:

A. That the Court award compensatory damages to him and against the defendants, jointly and severally, in excess of eighteen million dollars;

B. That the Court award punitive damages to him, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E. For any and all other relief to which he may be entitled.

Respectfully submitted,

September 22, 2006

Nick Brustin (NB0605)
Barry Scheck
Jennifer Laurin
Cochran, Neufeld & Scheck LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081
Attorneys for Plaintiff Barry Gibbs