UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
BARRY GIBBS,

       Plaintiff,

    -against-                                     MEMORANDUM AND ORDER
                                                      06-CV-5112  (ILG)

THE CITY OF NEW YORK, LOUIS
EPPOLITO, SR., JAMES FAIRCHILD,
LOUIS RANGO, JOHN MULDOON,
ANTHONY MARRA,

              Defendants.
------------------------------------------------x
GLASSER, United States District Judge:

       Before the Court is the plaintiff's motion for partial summary judgment seeking an Order that would declare that the defendant City of New York would be answerable under the doctrine of <u>respondeat superior</u> should defendant Eppolito be found liable for the malicious prosecution of the plaintiff as alleged in Count X of the complaint.

       The undisputed facts are taken from the statement of them in plaintiff's Local Rule 56.1 Statement in paragraphs 12-16, 19-20 which are admitted by the Defendants' Response to it.  Those facts are that the Robertson homicide investigation was reassigned to Detective Eppolito early on November 4, 1986, the day on which her body was found.  The reassignment was made by Inspector Richter in the presence of Detective Fairchild and Sargeant Muldoon.  Detective Eppolito continued as the assigned detective through the conclusion of the criminal trial in February, 1988 at which the plaintiff was convicted, more than fourteen months after Ms. Robertson's body was discovered.  Detective Eppolito was assisted in the investigation by Detective Louis Rango who was assigned to the Brooklyn South Homicide Bureau and by other

detectives. Eppolito reported that he conducted sixteen interviews, prepared thirty-eight DD5s between November 4, the day Robertson's body was discovered and November 14, 1986, the day on which the plaintiff was arrested. Detective Rango accompanied Detective Eppolito on a number of the interviews. Some of the DD5s were prepared by Eppolito at the 63rd precinct and several of them were signed off on by his direct supervisor Sargeant Muldoon. During the course of the investigation and before trial Detective Eppolito met in the precinct with Assistant District Attorney Bakken and with Assistant District Attorney Andrew Dember of the Kings County District Attorney's Office. During the investigation, Eppolito maintained a Robertson investigation file together with other homicide files in an unlocked file cabinet in the Sargeant's Office which was also kept unlocked. That file was available to any detective in the precinct. During the course of the investigation, other detectives typed DD5s which were also maintained in the file. No representative of the City of New York ever suggested to Eppolito that any of his activities in connection with the Robertson investigation were outside the scope of his duties and responsibilities as a NYPD detective.

## DISCUSSION

Although volumes can be filled with nothing more than the reiterated standard applicable for determining a motion for summary judgment, convention requires that it be stated again to be that the motion may be granted as a matter of law where the record shows "that there is no genuine issue as to any material fact." Cited for elaboration of that simply-stated principle are, generally, <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986), <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), and

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Volumes could also be filled with nothing more than the reiterated doctrine of respondeat superior, which, stated in a nutshell is that "a master is vicariously liable for a tort committed by his servant while acting within the scope of his employment." Riviello v. Waldron, 47 N.Y.2d 297 (1979). But as has been noted in an unrelated context, it is one thing to put that doctrine in a nutshell; it is quite another thing to keep it there. See, Leach, Perpetuities in a Nutshell, 51 Harv. L. Rev. 638 (1938). That truism was recognized long ago, in this context in Mott v. Consumers' Ice Co., 73 N.Y. 543 (1878) in which that Court observed that although, "[t]he general principles, by which the liability of the master to respond for the consequences of the wrongful acts of his servant . . . have . . . become quite familiar, . . . the only difficulty has been, and is, to apply them to the different circumstances under which the question arises." 73 N.Y. at 547. That difficulty was echoed more than a hundred years later in Riviello: "the rule may appear deceptively simple but, because it depends largely on the facts and circumstances peculiar to each case, it is more simply said than applied." 47 N.Y.2d at 302.

Instructive for the determination of this motion, however, is that Court's acknowledgment of the reality that

> social policy has wrought a measure of relaxation of the traditional confines of the doctrine (see Restatement, Agency 2d, § 219, Comment [a]). Among motivating considerations are the escalation of employee-produced injury, concern that the average . . . victim, when relegated to the pursuit of his claim against the employee, most often will face a defendant too impecunious to meet the claim, and that modern economic devices, such as cost accounting and insurance coverage, permit most employers to spread the impact of such costs (see

> Prosser, Torts [4th ed], § 69; Seavey, Agency, § 83). So, no longer is an employer necessarily excused merely because his employees, acting in furtherance of his interests, exhibit human failings and perform negligently or otherwise than in an authorized manner. Instead, the test has come to be " 'whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions.

47 N.Y.2d at 302 (citations omitted).

Judge Fuchsberg's observations were essentially those made almost 130 years ago by the then-to-be Justice O.W. Holmes. Jr. in the timeless, The Common Law (Little Brown, 1881) who wrote on p. 6:

> A baker's man, while driving his master's cart to deliver hot rolls of a morning, runs another man down. The master has to pay for it. And when he has asked why he should have to pay for the wrongful act of an independent and responsible being, he has been answered from the time of Ulpian to that of Austin, that it is because he was to blame for employing an improper person. If he answers, that he used the greatest possible care in choosing his driver, he is told that that is no excuse; and then perhaps the reason is shifted, and it is said that there ought to be a remedy against some one who can pay the damages, or that such wrongful acts as by ordinary human laws are likely to happen in the course of the service are imputable to the service.

The foregoing is not to suggest that the Court endorses the imposition of liability without fault, based on a view that the deep pocket should pay for no other reason than that the wrongdoer was an employee. Turk v. McCarthy, 661 F. Supp. 1526 (E.D.N.Y. 1987) on which the City relies where the policeman's conduct was motivated by nothing more than intolerable hubris was such a case. Social policy does not support extending the boundary of traditional doctrines to encompass McCarthy-like conduct that is not "imputable to the service."

Recognizing the general rule that the question of whether a particular act was

4

within the scope of employment is dependent on factual considerations and so is ordinarily one for the jury, the Court also recognizes that it may make that determination as a matter of law where the essential facts are not disputed. Pizzuto v. County of Nassau, 239 F. Supp. 2d 301, 314 (E.D.N.Y. 2003). Given the undisputed facts related above, the Court is driven to conclude as a matter of law, that the traditional doctrine of respondeat superior, is applicable to the City of New York, completely confident that no reasonable jury would fail to find that Eppolito was acting within the scope of his employment in maliciously prosecuting Gibbs.

An inquiry into the undeclared motives prompting the conduct of a policeman to determine whether he was acting within the scope of his employment, which the City would require, is not constructive. The test must be an objective, not a subjective one. That the test is an objective one is readily confirmed by an appraisal of the factors to be weighed in determining whether a given act is within the scope of employment, not one of which is subjective. See Riviello, 47 N.Y.2d at 303. Absent direct proof of an expressed intent to serve his own interest and not his master's, it falls to the Court or to the jury to divine the state of the servant's mind at the relevant time. That state of mind, intent, juries are routinely charged, is rarely established by direct proof but may be inferred from the surrounding facts and circumstances and from the servant's conduct. The determination thus of intent may be plainly speculative and give rise to questions of justice and fairness as Nelson v. American-West African Line, 86 F.2d 730 (2d Cir. 1936) (L. Hand, J.) demonstrates. That case is frequently cited for the pronouncement that, "[a] principal is not chargeable with willful acts, intended by the agent only to further his own interest, not done for the principal at all. But motives may be mixed;

5

men may vent their spleen upon others and yet mean to further their master's business; that meaning, that intention is the test." Id. at 731 (internal citations omitted). That action was brought against a ship owner by a seaman lying in his bunk a half-hour before he was to go on watch. The boatswain, returning from off-duty ashore where he got roaring drunk, struck the seaman across the face with a wooden bench, shouting as he did so, "Get up, you big son of a bitch, and turn to." The trial judge dismissed the case at the end of the plaintiff's proof on the ground that at the time of the assault the boatswain was not acting for the ship. That was the only issue on appeal where that judgment was reversed for the reason I set out at some length:

> [T]he boatswain was blind drunk, and through his clouded mind all sorts of vague ideas may have been passing; <u>the fact that he had made himself incompetent to further the ship's business was immaterial, the owner had selected him to command, whatever his defects and his addictions</u>. If he really meant to rouse the plaintiff and send him upon duty, if he really meant to act as boatswain and for the ship, however imbecile his conduct it was his master's. We are disposed to think that when he told him not only to get up, but to 'turn to,' that order was some evidence that he meant to act for the ship, and not alone to satisfy his vindictive passions.[1]

86 F.2d at 732 (emphasis added)

Acknowledging that, "[t]he inquiry into the tangled mazes of a drunken boatswain's mind may be beyond the powers of a jury, but it is the fact upon which the case turns," the Court nevertheless concluded that "there was enough to justify them in finding that he supposed that he was acting as boatswain and not wholly as a petty tyrant." Id. It is respectfully submitted that the jury's determination of the tangled state

---

[1] The portion emphasized echoes Holmes, supra: the master should "have to pay for the wrongful act [of his servant] . . . because he was to blame for employing an improper person."

of that boatswain's mind might have been just as accurately made by the toss of a coin.

This case is not one of an isolated assault by a drunken sailor or by a hubristic off-duty policeman, but one of fourteen months of involvement in a homicide investigation by a detective. If, indeed, his secretly-held motives were mixed, his conduct over that extended period of time was instinct with the work of a detective, working on behalf of the City of New York and speaks louder than any words could. There is no need for an inquiry into what was or was not in the "tangled mazes" of Eppolito's mind.

Referring back to the undisputed facts outlined above, they describe and define the function of a detective assigned, as Eppolito was, to investigate the murder of Ms. Robertson. Who else but a detective would be thus engaged? To ask the question is to answer it. He was surely not acting as a private citizen. Sixteen persons would not unquestioningly submit to being interviewed by an inquisitive stranger; an ordinary civilian would not be completing and filing police reports known as DD5s and having them approved by someone within the precinct who had the authority to do so. The persons being interviewed submitted to Eppolito's display of authority, his gold shield, without asking themselves whether he was serving some other master or some purpose other than investigating a homicide as a detective of the New York City Police Department.

The defendant City acknowledged as much at oral argument of the motion in the following colloquy:

> THE COURT: . . . Now, initially when the victim was found, Detective Canderozzi, or whatever his name was, was initially assigned and almost immediately thereafter Detective Eppolito became assigned as the detective to handle this case. And he remained assigned throughout the

|              | conclusion of the criminal trial, he was the detective in the case. I don't know, I assume he testified during that criminal trial. |
|---|---|
| MS. REDDY:   | Yes, that's correct. |
| THE COURT:   | And he interviewed countless witnesses in the course of discharging his function as a New York City police detective, he prepared numerous reports, what are known as DD5s in police jargon, he did that, and he maintained a file and he worked with other detectives who were with him during the course of interviews and in the course of investigating the facts underlying this offense. He wasn't acting as some volunteer, was he – |
| MS. REDDY:   | No. |
| THE COURT:   | – doing all that. He was acting as a detective of the New York City Police Department. |
| MS. REDDY:   | When he completed the DD5s – |
| THE COURT:   | He was wearing a gold shield which he would show to evidence his authority when he approached somebody to interview and so on. He was clearly acting as a New York City police detective, wasn't he? |
| MS. REDDY:   | Well, yes, but it remains in dispute whether the alleged misconduct occurred on or off duty and what capacity – |
| THE COURT:   | There's no dispute that he was acting as a New York City police detective, is there? |
| MS. REDDY:   | No, not when he investigated this case and completed the department reports and conducted the interviews, no, he was acting as a detective. |
| THE COURT:   | That's what police detectives do. |
| MS. REDDY:   | Right. |

Tr. at 15-16.

If Holmes was right that, "[t]he life of the law has not been logic: it has been

8

experience," then it may be agreed that liability is imposed upon the City of New York for the tortious conduct of its policemen by reason of the special role policemen play in a civilized society and the special relationship that exists between the policeman and the citizen.  It is that special relationship and the exceptional confidence that the citizen reposes in the policeman which is, perhaps the true reason for the imposition of liability upon the City.  When the policeman, by conduct "imputable" to his service, abuses that confidence he almost always harms the citizen in ways that are peculiar to that relationship in that they invariably involve an affront to a right guaranteed by our Constitution.  It is needless to say that a detective should not be invested with the authority to behave unconstitutionally.

    A case exquisitely applicable to this one and which informs, if not compels, the conclusion to be reached in this case is <u>Limone v. United States</u>, 271 F. Supp. 2d 345 (D. Mass. 2003); 336 F. Supp. 2d 18 (D. Mass. 2004); 497 F. Supp. 2d 143 (D. Mass. 2007); <u>aff'd on other grounds</u>, 579 F.3d 79 (1st Cir. 2009).  Simply stated, the plaintiff and two others were convicted of murder and sentenced to life imprisonment.  After serving nearly thirty years disturbing revelations cast doubt upon the convictions.  It was then disclosed that the FBI had suppressed intelligence which in due course resulted in the convictions being vacated and all charges dropped.  The newly disclosed information suggested that the convictions were obtained by perjured testimony and suppressed exculpatory evidence.  Actions were then commenced against the United States under the Federal Tort Claims Act ("FTCA") for the common law torts of malicious prosecution, intentional infliction of emotional distress and negligent supervision of employees, as well as <u>Bivens</u> claims against individual FBI agents.  Particularly relevant

9

to this case is the argument of the FBI agents that the state law claims against them were precluded by the FTCA, 28 U.S.C.A. § 2679(d)(1) which provides in relevant part that "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his . . . employment at the time of the incident out of which the claim arose, any civil action . . . commenced upon such claim . . . shall be deemed an action against the United States . . . and the United States shall be substituted as the party defendant." The Attorney General filed a certification of the FBI agents that they were acting within the scope of their employment. 271 F. Supp. 2d at 365 .

The City of New York similarly admitted that policemen were acting within the scope of their employment when they falsely testified that the defendant dropped a bag containing heroin and possessed a gun when they arrested him. Based on that testimony, the defendant was convicted and served more than three years in prison before the perjured testimony was revealed. <u>Morillo v. City of New York</u>, No. 95 Civ. 2176, 1997 WL 72155 (S.D.N.Y. Feb. 20, 1997).

In the light of my view that the only meaningful test for determining whether the servant was engaged in his master's business at the relevant time is an objective one, fourteen months of engagement in a homicide investigation in his capacity as a detective should be and I find to be decisive. If the operation of one's mind were capable of being plumbed with reliability to identify motive, then even if Eppolito were motivated in part to further the service of his master <u>respondeat superior</u> would be applicable. The City defendant acknowledged this to be so as evidenced by this brief excerpt of its counsel's remarks at oral argument: "Acting within the scope of employment requires that the employee is acting at least partially in furtherance of his employer's interests. . . ." Tr. at

12; see also Restatement (Second) of Agency § 236.

For all the foregoing reasons, the plaintiffs' motion for partial summary judgment is granted.

SO ORDERED.

Dated: Brooklyn, New York
May 28, 2010

/s/
I. Leo Glasser